State, ex rel. Funke, v. Lancaster County.

STATE, EX REL. FRED FUNKE ET AL., RELATORS, V. LANCAS-
TER COUNTY ET AL., RESPONDENTS.

FILED JULY 13, 1923. No. 23158

1. **Highways:** PAVING: "PROPORTION." The word "proportion" as
   used in the second paragraph of section 2625, Comp. St. 1922,
   means or signifies part, or portion.

2. **Mandamus:** PAVING: ASSESSMENTS: CORRECTION OF ERRORS.
   Mandamus is not a proper remedy to obtain redress from errors in
   making assessments for special benefits by a board of equalization,
   when the statute affords an adequate legal remedy.

Original proceeding in mandamus to compel respond-
ents to relevy special assessments for paving roads. *Writ
denied.*

*Peterson & Devoe,* for relators.

*Charles E. Matson* and *Hainer & Flansburg, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, DEAN,
DAY and GOOD, JJ., BUTTON, District Judge.

PER CURIAM.

In this, an original action in this court, the relator,
the owner of land in improvement district No. 38, in
Lancaster county, Nebraska, on behalf of himself and
others similarly situated, brings this action against Lan-
caster county and the county commissioners of said
county, praying for a writ of mandamus to compel the
county commissioners of said county to give notice, as
provided by law, and thereupon to reconvene as a board of
equalization and relevy special assessments on all of the
property in said district, in accordance with the net
special benefits to such property, and to allow damages
to any such property by reason of the improvement
made, as provided by law. To the petition the respond-
ents have interposed a general demurrer. The issue for
determination is the sufficiency of the averments of the
petition to entitle relator to the relief sought.

Besides the necessary formal allegations, relator al-
leges that the county board did not, in the resolution
creating the district designate and fix the proportion of

the total cost, of such work and improvement that would be paid out of the county paving fund, as required by statute, but arbitrarily fixed the amount which should be paid out of the county paving fund at $10,000 per mile, but which should not exceed one-half the total cost per mile; and that the board of equalization thereafter levied assessments upon the property within the district for the total cost of said improvement, less $10,000 per mile, without any reference to proportional benefits and proportional expenditures as between the county and property owners within the district, and without reference to the excess of such cost over the estimate fixed by the county surveyor; that said estimates of the total cost of the improvement ranged from $178,779.23 to $257,970, and that the total cost of the construction was approximately. $300,000; that relator owned 77 acres of land within the district which was assessed for benefits at the sum of $10,175.88, being six times the value of the special benefits accruing from the improvement.

Other irregularities in the proceedings are alleged, but apparently are not relied upon, as they are not discussed in the briefs, and they will not be considered in this opinion. Relator claims that by reason of the irregularities the board of equalization was without jurisdiction to make the assessments for benefits conferred upon the properties within the district by reason of the construction of the improvement.

The question presented for determination depends on the proper construction to be placed upon section 2625, Comp. St. 1922. Said section, *inter alia,* provides: "Such districts shall be created by resolution of the county board, and said board shall in said resolution designate and fix the proportion of the total cost of such work and improvements which shall be paid out of said county paving fund which proportion shall in each case be not more than one-half the total cost, and in fixing such proportion of cost said board shall use its discretion and judgment, taking into consideration the whole nature

and value of the territory of the district and the benefits to be derived thereby from such improvement. To pay the remaining cost of such work and improvements said board shall levy special assessments upon all such lots, tracts and parcels of land, or portions thereof in such district in proportion to benefits from such improvements."

It will not be contended that assessments in excess of special benefits derived from the improvement could be lawfully levied against the property within the district. Relator concedes, and we think it reasonably clear from a consideration of the entire statute, that it is intended that assessments shall not exceed the benefits accruing from the construction of the improvement. Relator contends, however, that the part of section 2625 quoted above requires the county board to take into account, not only special benefits, but also the public benefits to be derived from the improvement, in fixing the proportion of the total cost of construction which shall be paid out of the county paving fund; that the county board erred in fixing an arbitary sum which should be paid out of the paving fund; that, instead, it should have required a certain percentage of the total cost of construction to be paid from the paving fund, and that the board, in fixing the sum of $10,000 a mile, was not following either the spirit or letter of the statute, and its action in that respect worked a grievous wrong to the property owners of the district, in that the balance of the cost of construction over $10,000 a mile was, in fact, assessed against the property within the district.

Relator insists that it was the intention of the legislature that the board of county commissioners should consider and determine, at the time of creating the district, the relative benefits to the public at large, on the one hand, and the benefits to the property of the district, on the other, that would accrue from the construction of the improvement, and that it should fix the ratio of one to the other, or fix the percentage of the total cost that

would be paid from the county paving fund, which would automatically fix the percentage of the cost that the property owners would pay; that the question of fixing this ratio was not open to the board of equalization, and that, if the county board did not have in mind some ratio when it fixed $10,000 a mile as the proportion of cost to be paid from the paving fund, then the proceedings are void, and, if it did have in mind some ratio or percentage of the cost which the county paving fund should pay, then such ratio or percentage must be followed by the board of equalization in making the assessments for benefits to the several tracts and parcels of land in the district; and he assumes that the ratio the county board had in mind was that existing between $10,000 a mile and the estimated cost per mile, and that, since the final total cost is greatly in excess of the estimated cost, such excess of cost over the estimate should be apportioned to the paving fund and the property in the district, in the ratio existing between $10,000 a mile and the estimated cost per mile. Relator contends that he is entitled to the writ; regardless of whether the board of county commissioners had in mind a definite percentage of cost which the paving fund should pay. The argument is ingenious, but not convincing. If, as contended by the relator, the failure of the county commissioners to fix a definite percentage of the cost which should be paid from the paving fund would render the proceedings void, then it would follow that the board of equalization would not be authorized to make any assessment for benefits, and no writ could issue to compel it to reconvene and relevy assessments, when it had no authority to make such assessments. Relator's suggestion, that the county board, in designating $10,000 a mile as the proportion of cost to be paid from the county paving fund, fixed the amount with reference to the estimated cost per mile, is untenable for the reason that the statute requires the proportion, of cost payable from the paving fund to be fixed in the resolution creating the district, while the estimate

of cost of the improvement cannot be made until a later date.

1. The final solution rests on the meaning of the word "proportion," as used in that part of section 2625, above quoted. Among other definitions of the word "proportion," given by Webster's New International Dictionary are the following: "The relation of one portion to another, or to the whole, or of one thing to another, as respects magnitude, quantity, or degree." "The portion one receives when a whole is distributed by a rule or principle." "A share." Among the definitions given by the Century Dictionary are: "The relation of one part to another or to the whole with respect to magnitude." "Just or proper share; in general, portion."

In determining the meaning that should be given the word as used, it is proper to consider the situation and conditions under which the county board must act in creating an improvement district. At that time, the board has accurate knowledge of the amount available in the paving fund and may know approximately the amount that can be raised by any levy that has been made for the fund, but it cannot, at the time the district is created, have even approximate knowledge of the cost of the improvement, for no estimate of cost has then been made and the kind of paving has not been determined, and the power to determine the kind of paving to be used then rests in the property owners, and not in the county board. It is well known that one kind of paving may cost twice as much as another. The county board could not, in the nature of things, if it designated a percentage of the cost payable from the paving fund, know whether there would be sufficient for the purpose, unless it should fix a very small percentage as the share the paving fund should bear. It will not be presumed that the legislature intended to impose on the county commissioners an impossible condition. The board could intelligently act in the premises by fixing a specific sum that the paving fund should contribute to the whole im-

provement, or a specific amount per mile, but could not act in that respect if a percentage of cost was fixed. Reason dictates that the proper meaning to be given the word, as used in the statute, is, "share, part or portion." That the legislature used the word "proportion" in the sense of "part" is indicated by the following language in the first proviso in said section 2625: "No such work and improvements shall be finally ordered or constructed unless a petition shall be signed by the owners of a majority of the property chargeable with the cost of the improvement or *part* thereof." The word "part" has reference to the cost and is used in the same sense that the word "proportion" is used in the earlier part of the section. With this construction adopted, the board of equalization was required, then, to levy the remaining amount of the cost, over and above $10,000 a mile, against the property within the district, but in no event to exceed the benefits conferred by the improvement.

2. Relator has alleged that the amount assessed against his property is six times the benefits derived from the improvement. If he was wronged by an assessment in excess of benefits, the statute afforded him an adequate remedy which he should have pursued, but mandamus is not a proper remedy to obtain redress from errors in making assessments for special benefits by a board of equalization, when the statute affords an adequate legal remedy. Comp. St. 1922, sec. 9225; *State v. Drexel*, 75 Neb. 751.

The allegations of the petition are insufficient to justify the issuance of the writ, and it is accordingly denied.

WRIT DENIED.

DEAN, J., dissenting separately.

I adhere to the views expressed by me in my dissenting opinion in the former case of *Brown Real Estate Co. v. Lancaster County*, 108 Neb. 514, so far as applicable here in respect of exorbitant taxation. The *Brown* case involved the same paving district which is

State, ex rel. Funke, v. Lancaster County.

under consideration here and in that case two judges besides the writer dissented. As shown in that case, the paved highway is 5¾ miles in length and the total cost approximates $300,000. It is known as the "Penitentiary-Insane Hospital Loop."

This is an original action in mandamus brought in this court for relief from the imposition of a special assessment for paving purposes which is so grossly excessive as to be confiscatory. Relators allege that they own 77 acres of land in the paving district which is assessed for $10,175.88 for paving purposes, and that the special assessment so made is six times the value of the accruing special benefits. The case coming on to be heard on the demurrer of respondents, the pleaded facts are therefore admitted. The demurrer was sustained and the writ was denied.

It appears that relators went before the board June 20, 1922, and demanded that it reconvene as a board of equalization under section 3, ch. 200, Laws 1915 (Comp. St. 1922, sec. 2627) and relevy special assessments on all the property in the district, not exceeding special benefits. The act provides:

"In cases of omission, mistake, defect, or any other irregularity in the proceedings on any special assessment said board, sitting as a board of equalization, upon giving notice, as provided in the first instance for levying assessments, shall have power to correct such mistake, omission, defect or irregularity, and levy or relevy, as the case may be, a special assessment on any or all property in the district, in accordance with the net special benefits to the property on account of such improvement, and may also make allowance or reallowance, as the case may be, of damages to any such property by reason of such improvement."

So that it plainly appears that the board had legislative authority and was clothed with jurisdiction to remedy an "omission, mistake, defect, or any other irregularity" in its former proceedings. However, the

board arbitrarily refused to comply with relators' lawful demand. Upon discovery by the board of the havoc which had been wrought under its mistaken application of the law, it seems that under the statute it should have complied with relators' reasonable request.

In view of the record I do not find it necessary to discuss all of the facts which are stressed in the opinion of the majority, but have devoted my attention to some other features suggested by the record and such law as appears to be applicable thereto. The act appears to be so involved and so lacking in coherency and clearness of expression that it is incapable of intelligent enforcement. That it is unworkable, and consequently void, is established by what the board did under the act, rather than by what counsel now say the law intended that the board should have done. It need scarcely be observed that the board is not vested with authority, nor is the court, to add anything to or to take anything away from a legislative act by strained construction or otherwise. A legislative act which is meaningless must so remain until remedied by a future legislature.

This excerpt from respondents' brief fairly sums up the main points of the argument upon which they rely:

"Even though the assessment is in excess of the benefits; or in excess of statutory provisions; or is disproportionate to benefits; or where the improvement is of no benefit to the property; or even where the improvement has been injurious to the property; or where the assessment is in excess of the cost of the improvement; or where the assessment was made without regard to benefit; or where extra charges are included in the assessment; or where there has been an exclusion of property benefited from the district; or where the improvement was of a general and of no special character and creates no special benefit, he is foreclosed if he does not appear before the board and appeal from its decision."

In view of the practical confiscation of relators' property which by the demurrer is admitted to be true, and in

view of the provision for a relevy in the act above cited, respondents' argument lacks much of being persuasive. Counsel go far and ask much. The topmost peak of technicality is touched by their contention. But technicalities cannot outweight equities. If counsel's argument is sound, the relators, and all in like situation, are indeed in a pitiable plight.

The rule which respondents invoke is merciless in its technical severity. But relators come with clean hands. They offer to do equity. They do not seek to destroy nor to invalidate the paving district. They say they are ready to pay the part of the paving cost which is properly chargeable against their property. All they ask is that the board be compelled to reconvene and perform a legal duty which it has not yet performed, and which under the law, if the court holds it valid, it is bound to perform. Their only protest is that they shall not be despoiled of their lands. The facts present a situation akin to forfeiture, which courts of equity abhor and from which equity unhesitatingly grants relief when in harmony with equitable principles. Relators would not gain anything but that which is their lawful due and the county would not lose anything to which it is lawfully entitled if the relief which relators seek were granted. They do not ask that the board be compelled to do anything more than it should be required to do under the plainest provisions of equity. In the case before us there is an entire absence of bad faith, or deceit, or fraud, or any other like compelling circumstance which should tend to prevent the granting of relators' prayer. Substantial grounds appear for equitable relief and should be applied to the end that so grievous a wrong may be righted. In a case where the scales are evenly balanced and a technical rule is to be invoked, let it be invoked on the side of justice, and not on the side of oppression. In this case the equities are clearly on the side of relators, and a rule should therefore be applied which would relieve from an injustice, rather than one which would impose an in-

justice.   A governing body should set a good example.

It is common knowledge that judicial notice is a part of the equipment of the legal mind.   The court is supposed to bring to the consideration of every case a knowledge of things which all persons are supposed to know, and when, under the circumstances disclosed by this record, a direct appeal for relief is made to this court in a case where a person is about to be despoiled of his property without due process, its hand should be raised to stay impending disaster.   Clearly the right to be heard should not be denied.   The law was made for man and not man for the law, and when by technical interpretation it fails to apply the principle of even-handed justice in the affairs of men its power for good will depart, and, if the law so fails of its purpose, respect for it will be lost.   In every civilized society the law should be permitted to grow and expand with the growth of the race and to keep step with its normal needs.

The normal development of law as applied to the relations of men is not a new subject.   This observation has been attributed to Aristotle:

"When the law speaks universally, and something happens which is not according to the common course of events, it is right that the law should be modified in its application to that particular case, as the lawgiver himself would have done, if the case had been presented to his mind.   Accordingly, the equitable man is he who does not push the law to its extreme, but, having legal justice on his side, is disposed to make allowances." 9 Encyclopedia Britannica. (11th ed.) p. 726.

It is elementary that the title to an act is that which conveys to the members of the legislature and to the world generally its contents.   It is said that some of the ruling despots of a period not so very long ago, as history is reckoned, formed the habit of writing the laws of their country in small print on placards which were placed at so great a height that they could not be read by the people.   When an unsuspecting subject was charged with violating a law, about which he knew nothing,

oftentimes, whether guilty or innocent, he was apprehended, tried and punished in his person or deprived of his property, as the terms of the law might warrant. And so, the tyrants said, the law was vindicated. But when the people became wiser and demanded that the laws be written so that they might be read by all persons, it was discovered that even under the new system drastic provisions for the deprivation of life, liberty or property, for inconsequential acts were frequently hidden away and surreptitiously concealed in an avalanche of written words. Subsequently and after a toilsome struggle, and to prevent the repeition of this very thing, demand was made by the people that a title be given to every act, and this demand, upon being granted, in a crude way outlined its contents. At a later period it came to pass that a title to an act became what its name implied, so that now the Bill of Rights of nearly all of the states provides that a title be given to every act and that its one and only subject be "clearly expressed" therein. This was not done in the act under consideration, though the reason for the rule remains.

The argument is made in relators' brief that they had not heard and did not know of any meeting by the board at which their protesting presence was required. Ordinarily this does not excuse, but there is here substantial basis for their plea in the fact that the title to the act under consideration (Laws 1915, ch. 200) made no reference to a vital subject, herein discussed, which was not embodied in the original act (Laws 1911, ch. 25) and which for the first time appeared in the body of the amendatory act. This was in direct violation of section 14, art. III of the Constitution, which provides:

"No act shall contain more than one subject, and the same shall be clearly expressed in its title."

So that as a matter of law, under the extraordinary facts presented here, relators' plea should be entitled to consideration. Of course, it is not intended that every end and every means that may be necessary to ac-

complish the general object of an act should be the subject of a separate act. Cooley, Constitutional Limitations (7th ed.) p. 205. But the title to the act involved here should have had some apt allusion to disclose fully and clearly its contents. Cooley, Constitutional Limitations (7th ed.) pp. 211, 212, 214.

A reference to the title of the amendatory act in question (Laws 1915, ch. 200), which is complete in itself, as hereinafter noted, will disclose that there is not a sentence nor an expression therein directing attention to the fact that such objection to an excessive special assessment as a landowner may have must be submitted to the board of equalization, nor is there any reference in the title to the fact that "no court shall entertain any complaint" which was not theretofore made to the county board of equalization. The title to the act follows:

"An act authorizing county boards of counties containing a city of the first class, having a population of over 40,000 and less than 100,000, to grade, pave, repave or macadamize roads, highways and boulevards outside such cities and other cities and villages in the county, levy a tax to aid in such work, issue bonds and warrants therefor, create improvement districts and levy special assessments upon real estate therein in proportion to benefits for such work, providing for the performance of such work, and repealing sections 2916, 2917, 2918, and 2919 of the Revised Statutes of Nebraska for 1913, and declaring an emergency."

Titles to legislative acts, in almost all states, by reason of constitutional provisions, exclude everything from effect and operation as law which is incorporated in the body of the act, but is not within the purpose indicated by the title. Cooley, Constitutional Limitations (7th ed.) p. 202; *People v. Mahaney,* 13 Mich. 481; *Sun Mutual Ins. Co. v. Mayor,* 8 N. Y. 241.

A very familiar provision of the Bill of Rights is this: "The right to be heard in all civil cases in the court

of last resort, by appeal, error, or otherwise, shall not be denied." Const., art. I, sec. 24.

And the relators, upon advice of counsel and in the firm belief that they had a real grievance and were about to be deprived of their property without just compensation therefor, and without due process, under a provision of the fundamental law, appeared in the court of last resort to obtain relief. True, the appearance was not by appeal, nor by error. But they appeared and they believed that the fundamental law meant what it said when it guaranteed that their "right to be heard" in that court should not be denied.

The act by its terms purports to set at naught the effect of section 24, art. I, of the Constitution. Strange as it may seem, the act provides for nothing less. While, of course, it could not achieve that purpose, it appears, when the entire act is considered, to have been the inducement for its passage.

The especially objectionable feature of the act follows, and it is clearly violative of the constitutional provision above referred to:

"No court shall entertain any complaint that such party was authorized to make and did not make to said board when sitting as a board of equalization." Laws 1915, ch. 200, sec. 4 (Comp. St. 1922, sec. 2628).

That provision introduces a new and drastic measure, a stranger to the act which it amends, into the jurisprudence of the state. However, whether it was referred to in the title or omitted therefrom, for the reasons stated, it is an invalid provision. It is not to be presumed that the legislature intended to provide that the property of any person should be taken or damaged for public use without just compensation therefor, nor that it intended to enact a confiscatory act, nor that, after discussion and deliberation, it intended to impose so sweeping a curtailment of the right of the court of last resort to exercise its function in a proper case, even though the party litigant did not first appear before a county board

to make a protest. Clearly a statute which attempts to place a limitation upon the exercise of the equitable jurisdiction of this court, in violation of a provision of the Bill of Rights, is to that extent void.

In the main opinion it is said:

"Relator has alleged that the amount assessed against his property is six times the benefits derived from the improvement. If he was wronged by an assessment in excess of benefits, the statute afforded him an adequate remedy which he should have pursued."

I do not agree with the conclusion of the majority, nor do I believe that the language of the act is applicable to the pleaded facts here. In my judgment that part of the act which provides for a hearing before the board of equalization for obvious reasons does not afford an adequate legal remedy against a confiscatory special assessment; but, even if it does, the remedy is not exclusive nor is it within the power of the legislature to make it so under the Bill of Rights herein cited.

For relief from an excessive and illegal levy the act, which purports to be complete in itself, as hereinbefore pointed out, undertakes to provide for an appeal, but the terms it fixes are so arbitrary as to be prohibitive. The terms are "inadequate" in the statutory sense. The remedy which the majority opinion says is adequate follows:

"Any party feeling aggrieved by any special assessment, allowance of damages, or proceeding for paving or improving as by this act provided, may pay the said special assessments levied upon the real estate of such party, or such instalments thereof as may be due at any time before the same shall become delinquent, under protest, and with notice in writing to the county treasurer that such party intends to sue to recover the same, which notice shall particularly state the alleged grievance and the grounds therefor; whereupon such party shall have the right to bring a civil action within 60 days thereafter, and not later, to recover so much of the

State, ex rel. Funke, v. Lancaster County.

special assessments paid as such party shows to be illegal, inequitable and unjust, the costs to follow the judgment or to be apportioned by the court as may seem proper." Laws 1915, ch. 200, sec. 4 (Comp. St. 1922, sec. 2628).

The remedy is not adequate as to the aggrieved person, because it provides that he shall pay the special assessment under protest and afterward try out the question of its legality in the courts. It is obvious that a remedy that is conditioned upon assuming a burden so onerous as paying a large sum of money into the public treasury under protest, there to remain for an indefinite period, awaiting the last and perhaps long delayed word of any court, is not an adequate remedy in this class of cases. From the fact that the statute which provides for the remedy also provides that the costs which follow the judgment will be apportioned by the court as may seem proper seems to indicate that any recovery by the aggrieved person shall be chargeable to the county and be paid out of the county treasury. But, as with other features of the act, much is left to conjecture on this point.

"An adequate remedy is a remedy which is equally beneficial, speedy, and sufficient; not merely a remedy which at some time in the future will bring about a reversal of the judgment * * * complained of * * * but a remedy which will promptly relieve the petitioner from the injurious effects of that judgment, and the acts of the inferior court or tribunal." *State v. Guinotte,* 156 Mo. 513, 50 L. R. A. 787. See also, *Walla Walla City v. Walla Walla Water Co.,* 172 U. S. 1; *San Jose L. G. I. R. Co. v. San Jose R. Co.,* 156 Fed. 455.

"The existence of a remedy at law does not deprive equity of jurisdiction unless such remedy be adequate. By this is meant that it must be clear, complete, and 'as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'" 16 Cyc. 41.

*State v. Drexel*, 75 Neb. 751, is cited in the majority opinion, but, in view of the circumstances and the law there involved, as compared with the facts and the fundamental law which is applicable here, that case is not authority here.

The questions presented by this record are comparatively new not only to the jurisprudence of this state, but of every state. The introduction of motor propelled vehicles into the already complex relations of life has brought about conditions which were unthought of only a few years ago. The automobile, which is here to stay, is the greatest factor in the business and social life of this age, and by it the fundamental activities of our people have been vastly changed. The building of paved highways in the open country, which is mainly involved here, and the making of paved streets and concrete boulevards in and adjacent to cities, towns and villages are among the principal and most costly of the innovations which have followed closely upon the development of the automobile and of trucks for freighting. And all of this has imposed new and untried duties and burdens upon all the people in their mutual relations everywhere. Small wonder that, in view of the premise, the legislature should inadvertently combine impossible conditions and legislative incongruities in an unworkable act. In passing it may be noted that the same difficulties, and greater, will be encountered when the congress and the legislatures of the several states undertake to regulate the use of the radio and the air lanes in the skies.

It is said by a modern writer that, while courts of equity may not assume jurisdiction which is nonexistent, they may avail themselves of new remedies and unprecedented orders to meet emergencies when based on sound principles which are calculated to afford necessary relief without imposing illegal burdens. 10 R. C. L. 263, sec. 9.

I concede that a long recognized and firmly established rule of law, which does no violence to the

supreme law, under which rights of persons and of property have grown up and have been developed, is entitled to recognition, even though some hardship may result in its application to the individual case, and this because of the importance of having a settled rather than a vacillating system of law. But that question is not at all involved here, because the conditions under consideration are new and the law which is here involved is a pioneer in its field.

The majority of the court having sustained the act in question, I respectfully submit that, under the admitted facts, the writ should have been allowed and a relevy ordered. The application having been denied, I dissent from the judgment herein rendered.